# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 95 C 5220 | **DATE** | 8/2/2001 |
| **CASE TITLE** | Hays, Jr., et al. Vs. General Electric Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion for summary judgment (117-1) is granted in part and denied in part. Summary judgment is granted in part and denied in part on counts III and IV, and granted on counts I and II. Pretrial order to be filed by 9/28/01. Response to any motions in limine due by 10/12/01. Pretrial conference set for 10/26/01 at 2:00 p.m. at which time a date for trial will be set. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | 5 |
| ✓ | Notices mailed by judge's staff. | | AUG 03 20 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | 8/2/2001 |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| MPJ | courtroom deputy's initials | | MPJ mailing deputy initials | |

ED-7
FILED FOR DOCKETING
01 AUG -2 PM 6: 12

Date/time received in central Clerk's Office

Document Number

183

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILLIAM G. HAYS, JR. as                )
liquidating agent for RDM              )
HOLDINGS, INC., f/k/a                  )
ROADMASTER CORPORATION,                )
                                       )
            Plaintiff,                 )
                                       )    No.  95 C 5220
      v.                               )
                                       )
GENERAL ELECTRIC COMPANY,              )          DOCKETED
                                       )
            Defendant.                 )        AUG 0 3 2001

### MEMORANDUM OPINION AND ORDER

Roadmaster Corp. ("Roadmaster") sued General Electric Co.
("GE") for breach of contract (Count I) and breach of express and
implied warranties (Counts II, III, and IV) arising out of the
failure of GE motors that Roadmaster used in its treadmills.[1]  GE
moves for summary judgment on all four counts.  The motion is
granted in part and denied in part.

I.

In the 1990s, Roadmaster was one of the leading manufacturers
of exercise treadmills.  Beginning in 1993, it tested GE drive-
systems for its treadmills, which consisted of a 2.0 horsepower
electric motor ("motor"), an electric controller and a fan system.
The motor passed Roadmaster's internal qualification testing in

---

[1] Roadmaster was a Delaware corporation with its principal
place of business in Illinois.  Roadmaster declared bankruptcy in
1997, and the case is being prosecuted by William Hays, the trustee
in bankruptcy. GE is a New York corporation with its principal
place of business in Connecticut.

August 1993, and Roadmaster submitted its first purchase order for the motor to GE in October 1993. Roadmaster installed the motors in its treadmills, and in early 1994 it began to receive reports that some treadmills would "runaway" (the parties' term), or accelerate to top speed without warning. PX 61 (customer complaints from 1/20/1994 to 4/13/1994).[2] During March and April, Roadmaster also received customer reports of another problem with the GE motors: they were overheating, smoking, spitting out plastic chips, and emitting a burning odor; one customer said she was afraid it would catch fire. GE produces five customer complaints that were marked as an exhibit at the deposition of Robert Bennett, Roadmaster's customer service manager. Four of the five reports contain no mention of any "runaway" related problem; one mentions that the motor raced up before it smoked and shorted out. Mr. Bennett said that these five reports were "typical complaints" of those received in early 1994, and although he could give no total number of complaints, he thought there were more than these five. DX 9 at 169-70.[3] In May and August, Roadmaster received two

---

[2] Exhibits to GE's Local Rule 56.1(a) statements and responses are designated herein as DX __; Roadmaster's exhibits to its Rule 56.1(b) statement are designated as PX __.

[3] Roadmaster objects that the attorney (one of Roadmaster's attorneys) questioning Mr. Bennett mischaracterized his testimony because she asked if the complaints were a "typical representation of the type of complaints that Roadmaster was receiving regarding the G.E. Motor overheating, smoking, and causing fire" and none of the documents referred to an actual fire. However, Mr. Bennett merely responded that the five complaints were "typical complaints." His testimony is clear enough.

reports of treadmill fires. DX 45, 46. Roadmaster continued to test the motor throughout 1994, and two tests in June and July show motor temperatures exceeding 160° Celsius when the motor was run between eight and 10.6 amps. DX 35A-B, 77.

GE redesigned the controller (increasing the amps from 10 to 16) in September 1994 to correct the "runaway" problem, but the motor design did not change. In late December 1994, Roadmaster received reports of "shorted armatures and melted brush holders" in treadmills with GE motors, and two damaged motors were sent to Brook Compton, the British manufacturer, by a GE temporary employee. PX 30. GE investigated, and on January 12, 1995, told Roadmaster that some of the motors had been manufactured by its vendor, Brook Compton, with brushes of an incorrect grade of resistance (European 220 volts instead of American 120 volts). Roadmaster recalled the treadmills with incorrect brushes. On February 13, 1995, Roadmaster told GE that there was a "non-brush related" problem with the motors overheating and failing at 4 miles per hour and 9 amps. A GE engineer said that "[t]he failed motors appear to be totally roasted with blackened windings." PX 69. Roadmaster says that the first reports of GE motor fires came to its attention in "early 1995" (12/14/2000 declaration of Bill Hebb) or "approximately January 1995" (12/13/2000 declaration of Charles Sanders); Roadmaster's earliest customer claim file in this case refers to a fire on January 6, 1995. Roadmaster claims that the

3

motors were defective, unfit for use in treadmills, and non-merchantable.

## II.

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In this diversity action, I apply Illinois substantive law. *Lexington Ins. Co. v. Rugg & Knopp*, 165 F.3d 1087, 1090 (7th Cir. 1999).

## III.

Before I address the contract and warranty claims, I must resolve a question of the scope of this lawsuit. GE claims that Roadmaster has changed its theory of the case in response to GE's motion for summary judgment. It argues that Roadmaster's recovery, if any, should be limited to claims involving the 2.0 horsepower motors, and should not encompass the controllers or the "drive-system," which consists of both the motor and the controller. The theory of the case is relevant to GE's claims that Roadmaster gave insufficient notice of the alleged defect or breach of warranty; if the problem was with the redesigned controller, then Roadmaster could not have known of the problem before September 1994, but if the problem was with the motor, Roadmaster had received reports of

overheating and possible fires several months earlier. The scope of Roadmaster's theory is also relevant to GE's argument that any implied warranties are excluded because Roadmaster examined and tested the motor before buying them; it is undisputed that Roadmaster tested the motors in 1993 and throughout the summer of 1994, and that it did not conduct any new qualification testing after the controller was redesigned in September 1994.

"A plaintiff may not amend [its] complaint through arguments in [its] brief in opposition to a motion for summary judgment." *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 606 (7th Cir. 2000). Although a complaint cannot be dismissed because the plaintiff has failed to identify a theory, or indeed, has identified the wrong theory, *Daniels v. USS Agri-Chemicals*, 965 F.2d 376, 381 (7th Cir. 1992), the plaintiff must commit to a theory of the case at some point, *see Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 774 (7th Cir. 1995). A change of theories at the summary judgment stage is not allowed because, ordinarily, discovery has been completed, and an eleventh hour change of theory would waste judicial resources and the resources of the parties.

Roadmaster's amended complaint alleges that GE sold "components for drive-systems" and that the "components consisted of controllers and 2.0 horsepower DC electric motors (the 'GE Motors')." In the next sentence, the controller and "GE Motors" are referred to separately, and all other allegations refer only to the

"GE Motor." From this it is unclear whether "GE Motors" refers only to the 2.0 horsepower motors or to both the motor and controller.[4] In response to GE's motion for summary judgment, Roadmaster argues that it is not just the motors, but the entire "modified drive system, delivered in September 1994, that Roadmaster contends was defective." It would be unfair to allow a defendant to define the plaintiff's theory of the case by seizing on an ambiguity in the complaint, and, after the plaintiff clarifies the ambiguity in response to summary judgment, claim that the plaintiff had "changed" its theory, but this is not such a case.

There is no dispute that GE sold the entire drive-system, including the motor and the controller, to Roadmaster. The question is whether the alleged defect or breach that is the subject of the complaint is in the entire drive-system, consisting of the motor and the controller, as modified in September 1994, or just the motor, without the controller. A "motor only" theory is supported by the reference to the controller and "GE Motor" in the sentence immediately following the definition of the "GE Motor"; if the term as defined included the controller, no separate reference would have been necessary. In addition, the complaint makes no reference to modifications to the controller or drive-system by GE in September 1994, so the complaint gives no notice of the actions

---

[4] Had the complaint said "2.0 horsepower DC electric motors and controllers ("GE Motors"), GE would have been on notice that "GE Motor" meant the whole component.

6

that Roadmaster now alleges are the basis of its claims. Moreover, the "representative example of the purchase order issued" that Roadmaster attached to the amended complaint is dated January 1994 and lists only the motor, not the controller or any other part of the drive-system. A party is entitled to plead theories of liability in the alternative, but the alternative must at least be apparent from the complaint. On its face, Roadmaster's amended complaint does not support its new theory.

Moreover, the opinions of Roadmaster's experts do not support a controller theory. Roadmaster's experts refer to the motor and control separately: Mr. Schram and Mr. Kabler[5] identify the allegedly defective motor (not the entire drive-system) by part number (the motor and controller have discrete part numbers), and neither mentions the September 1994 changes to the controller. Mr. Schram never mentions the controller as the source of the problem, but instead opines that there were two problems with the motor: (1) several of the motors manufactured by Brooks Compton in the United Kingdom contained incorrect brushes that caused increased resistance and motor heat; and (2) the motor, even properly

---

[5] Mr. Kabler is a damages expert; his opinion did not deal with causation. The most persuasive evidence that the parties understood Roadmaster's theory to include a defect in the controller (apart from opinion evidence from Roadmaster experts) would be a report from one of GE's experts that opined on this subject because it is inconceivable that the various expert reports would not discuss the theories of liability. Although Roadmaster filed a surreply to GE's reply in which it specifically addressed its theory of the case, it does not mention any of GE's expert reports.

manufactured, could not perform to its specifications and was not suitable for use in Roadmaster's treadmills.

Mr. Potter's report is titled "Opinion and Report of Suitability of G.E. 2HP Motor and Control System for the Roadmaster 10MPH Treadmill," and in it he mentions the redesign of the controller, but says that the motor was defective because (1) some were fitted with incorrect brushes; (2) the motor had an "open design" that allowed flames to pass out of the motor and spread; and (3) even with the correct brushes, the motor ran too hot and burned out even at 7 amps (below GE's rating of 9 amps). He says that the "major cause of the fires and extensive damage" was the use of incorrect brushes. Mr. Potter says that the problem with the brushes would never have occurred if the original controller had not been designed with an insufficient triac (a part of the controller), but he does not explain how the brushes in the motor, which was not redesigned, have anything to do with the redesign of the controller to correct the "runaway" problem. He also says that the "runaways" that precipitated the redesign of the controller were caused by "the excessive motor temperatures which occur at low speeds and high loads with the G.E. motor and control" -- evidence that the motors overheated before and after the redesign of the controller.

Further evidence that Roadmaster's theory of liability has never been based on the September 1994 controller redesign is the

testimony of its own attorney before a bankruptcy judge in the Northern District of Georgia.[6]  The attorney for the bankruptcy estate, Mr. Cahill, was called as a witness to offer "evidence more than an expectation that [Roadmaster's] assets will produce money for the creditors."  He testified that the case now before me "surrounds two problems with the motor," the first being the problem with the incorrect brushes, and the second the general unsuitability of the motor for treadmill use because of its tendency to overheat even with correct brushes. This case had been pending for four and half years at the time of the hearing, but Mr. Cahill never mentioned the controller or the September 1994 modifications. Mr. Cahill's statements are not binding judicial admissions for the purposes of this lawsuit, but I may consider them as evidence. *See Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996) (holding that statement in another suit operates as evidentiary admission, to be weighed with other evidence, not binding judicial admission). It is clear that Roadmaster's theory of liability, until its response to GE's motion for summary judgment, was that the motor component was defective and in breach of warranty, not the entire drive-system, and that its response to the summary judgment motion improperly attempts to

---

[6] Roadmaster attaches a partial transcript of a February 2, 2000, Hearing on Trustee's Emergency Motion for Authority to Purchase Indemnity Bond and on Confirmation of Second Amended and Restated Chapter 11.  DX 125.

modify the complaint. Roadmaster may only recover, if at all, for claims arising out of problems with the motors.

IV.

Roadmaster sues for breach of contract, as well as breach of express warranties of merchantability, freedom from design and manufacturing defects, and fitness for a particular purpose. In the alternative, Roadmaster sues under claims of implied warranties of merchantability and fitness for a particular purpose. GE argues that the contract did not contain the express warranties alleged by Roadmaster. In the alternative, it argues that any implied warranties are barred under U.C.C. § 2-607(3)(a) because Roadmaster failed to give notice of the breach, or under § 2-316(3)(b) because Roadmaster examined the motors before purchasing them.

A.

The parties agree that there was a contract (or series of contracts) governing GE's sale of motors to Roadmaster, but they disagree about what its terms are. This case presents a classic "battle of forms." GE argues that the price quotation it sent was the offer and that it included terms of sale disclaiming all warranties of merchantability and fitness for a particular purpose. Roadmaster claims that the front side of a purchase order that it faxed was the offer, and that the terms on the back side, which were not faxed, were part of the offer because Roadmaster sent a confirmation copy of the purchase order to GE, with the terms on

10

the back side, in the mail. Finally, GE sent invoices that included limitations of warranty remedies, and it argues that the limitations are enforceable.

I need not decide whether the price quotation was an offer, because even if it was, the purchase order was not an acceptance. Under Uniform Commercial Code ("U.C.C.") § 2-207(1), a "definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, *unless acceptance is expressly made conditional on assent to the additional or different terms.*" 810 ILCS 5/2-207(1) (emphasis added). Roadmaster's purchase order stated in bold capital letters at the top that "THIS ORDER EXPRESSLY LIMITS ACCEPTANCE TO THE TERMS STATED HEREIN AND ANY ADDITIONAL OR DIFFERENT TERMS PROPOSED BY THE SELLER ARE REJECTED UNLESS EXPRESSLY ASSENTED TO IN WRITING." This language is sufficient to invoke the "unless" proviso of § 2-207(1), so the purchase order acted as a counter-offer, not an acceptance. *See C. Itoh & Co. (America) Inc. v. Jordan Int'l Co.*, 552 F.2d 1228, 1235-36 (7th Cir. 1977); *Gord Indus. Plastics, Inc. v. Aubrey Mfg., Inc.*, 431 N.E.2d 445, 449 (Ill. App. Ct. 1982).

The purchase order was the offer. The invoice that GE sent in return contained similar language to that in the purchase order (stating that the sale was conditional on the terms of the invoice

and that additional or different terms would not be binding unless GE assented in writing) and likewise cannot constitute an acceptance. Therefore the exchange of forms does not establish a written contract. Under the U.C.C., however, "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract." 810 ILCS 5/2-207(3). This section comes into play where, even though there is no written contract, the parties go ahead and perform as if there were. *Album Graphics, Inc. v. Beatrice Foods Co.*, 408 N.E.2d 1041, 1045 (Ill. App. Ct. 1980). Here GE filled the purchase orders and delivered the motors, and Roadmaster paid at least some of the invoices, so their actions establish the existence of a contract.

When § 2-207(3) applies, "the terms of the particular contract consist of the terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of the Act." In other words, differing terms "fall out" and are replaced by U.C.C. defaults or "gap-fillers." *Northrop Corp. v. Litronic Industries*, 29 F.3d 1173, 1178-79 (7th Cir. 1994). In this case, the writings agree on the terms of price, quantity, place and time of delivery, but disagree on warranties, among other terms. The express warranty provisions as to merchantability and fitness fall out, but are replaced by similar implied warranties under U.C.C. §§ 2-314 and 2-315. Under the

12

U.C.C., an express warranty may be created when the seller provides a sample that is the basis of the bargain, 810 ILCS 5/2-313(1)(c), but Roadmaster does not argue that this warranty applies, so it has waived this claim for the purposes of this motion. *Pohl v. United Airlines, Inc.*, 213 F.3d 336, 340 (7th Cir. 2000). Summary judgment is granted on counts I and II.

B.

Roadmaster's theory of warranty liability appears to be based on two separate claims: (1) some motors were fitted with incorrect brushes and therefore were defective and unmerchantable, *see* 810 ILCS 5/2-314, and (2) even the motors with correct brushes were unfit for the particular purpose of powering a treadmill because of their tendency to overheat, *see* 810 ILCS 5/2-315. The warranty of fitness for a particular purpose applies only where the seller has reason to know of the particular purpose at the time of contracting and has reason to know that the buyer is relying on the seller's "skill or judgment to select or furnish suitable goods." *Id.* It is undisputed that GE knew that Roadmaster wanted to use the motor in its treadmills, and Roadmaster has produced a GE e-mail in which a GE engineer acknowledges that Roadmaster would not buy the motors unless they could qualify it for use in their "10 mph, 11-11.5 amp DC, treadmill." Roadmaster employees say that they relied on GE's skill to determine whether the motors fit Roadmaster's specifications, and although GE argues that Roadmaster alone made

the final decision whether to use the motors, that is not dispositive of Roadmaster's reliance on GE's skill in making its final decision. There is at least a question of fact as to whether the predicate requirements for the warranty of fitness exist in this case, and GE does not argue for the purposes of this motion that the motor was fit for Roadmaster's particular purposes. GE admits in its Answer that some treadmills had incorrect brushes, and does not argue that treadmills with incorrect brushes were merchantable. Because GE does not here dispute that its conduct breached both warranties, it will be entitled to summary judgment only if it can show that the warranties do not apply.

GE raises two U.C.C. defenses against the warranty claims: insufficient notice under U.C.C. § 2-607(3)(a) and waiver or exclusion of any implied warranties under U.C.C. § 2-316(3)(b). Roadmaster argues that both are affirmative defenses that GE waived by failing to plead them under Fed. R. Civ. P. 8(c). *See Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 235 (7th Cir. 1991). Rule 8(c) enumerates nineteen affirmative defenses, of which waiver is one, that must be pleaded, as well as "any other matter constituting an avoidance or affirmative defense." GE pleaded waiver of "any and all claims for breach of warranty" as its second affirmative defense. Although § 2-316(3)(b) does not itself use the term "waiver," Illinois courts have referred to it as a waiver provision. *See Murray v. Kleen Leen, Inc.*, 354 N.E.2d 415, 420 n.1

(Ill. App. Ct. 1976). In any event, GE's allegation that Roadmaster "qualified and accepted [the motor] for use" gives sufficient notice of a § 2-316(3)(b) claim to satisfy the notice pleading requirements of Rule 8(a). *See Tome Engenharia e Transpoprtes* [sic] *v. Malki*, No. 94 C 7427, 1996 WL 172286, at *11 (N.D. Ill. Apr. 11, 1996) (affirmative defenses subject to notice pleading).

Inadequate notice is not an enumerated defense. The Seventh Circuit has identified two approaches for determining what comes under the "any other" category of Rule 8(c) in diversity cases: a defense is an "affirmative defense" if the defendant bears the burden of proof under state law or if it does not controvert the plaintiff's proof. *Brunswick Leasing Corp. v. Wisconsin Cent., Ltd.*, 136 F.3d 521, 530 (7th Cir. 1998). Under either approach, § 2-607(3)(a) notice is not an affirmative defense because it is an essential element of the plaintiff's case, and accordingly one on which the plaintiff bears the burden of proof. *See Branden v. Gerbie*, 379 N.E.2d 7, 8-9 (Ill. App. Ct. 1978); *see also Stamper Black Hills Gold Jewelry v. Souther*, 414 N.W.2d 601, 604 (N.D. 1987) ("Failure to provide notice of breach under [§ 2-607(3)(a)] is not an affirmative defense which must be raised by the seller. Rather, notice is a condition precedent to the buyer's cause of action which must be pleaded and proved by the buyer in order to recover."). Neither defense is waived.

Section 2-607(3)(a) of the U.C.C. requires the buyer who has accepted tender to notify the seller of the breach within a reasonable time of discovering it, or else "be barred from any remedy." 810 ILCS 5/2-607(3)(a). Even if the seller is aware of problems with a product line generally, the notice requirement is satisfied only where the seller "is somehow apprised of the trouble with the particular product purchased by a particular buyer." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 590 (Ill. 1996). A buyer fulfills the notice requirement if the seller has actual knowledge of the defect of the particular product. *Id.* at 589.

Roadmaster argues that it was not required to give notice to GE because GE was aware of the defect. It produces evidence that Roadmaster forwarded repair reports to GE in February 1994, mostly dealing with controller failures and runaways, but one report says the motor ran "wide open" after short use (elsewhere referred to as a "runaway") and then says "motor overheats caused by armature windings overheated and melted plastic dividers." PX 79. Roadmaster also produces an April 12, 1994, e-mail from a GE engineer to Martin Swindell at Brooks Compton acknowledging "some armatures with melted spiders." PX 311. Though the e-mail discusses GE's "treadmill motor insulation system," there is nothing suggesting that Roadmaster treadmills were involved, and GE manufactured motors for other treadmill manufacturers in addition

to Roadmaster. Even drawing all inferences in favor of Roadmaster, a reasonable jury could not conclude from one repair report that mentioned overheating in the context of a runaway complaint and an inconclusive e-mail that GE was "somehow apprised of the trouble" --here, a tendency to overheat-- "with the particular product." *Connick*, 675 N.E.2d at 590. Therefore the only questions are when Roadmaster discovered the problem with the motor and whether the time between its discovery and notice to GE was reasonable.

The parties agree that Roadmaster first formally notified GE of problems with the motor overheating and burning out in December 1994, and of the motor fires on February 13, 1995. GE's suggestion that it did not have notice for the purposes of § 2-607 until Roadmaster's March 9, 1995, demand letter is without merit. GE relies on language in the *Connick* opinion that "the notice 'of the breach' required is not of the facts, . . . but of the buyer's claim that they constitute a breach." 675 N.E.2d at 590 (quoting *American Mfg. Co. v. United States Shipping Bd. Emergency Fleet Corp.*, 7 F.2d 565, 566 (2d Cir. 1925) (L. Hand, J.)). However, the Illinois Supreme Court went on to say that the notice requirement of § 2-607 is satisfied where the seller knew of the problems with the product and that the buyer wanted them remedied; a jury could conclude that GE knew this in December 1994.

In spite of the melted motor parts it sent to GE in December 1994, Roadmaster argues that it did not have notice of the problems

17

with the motor until it received the first report of a treadmill fire in January 1995. GE argues that several tests conducted by Roadmaster in the summer of 1994 would have given Roadmaster knowledge of the lack of fitness, *viz.*, the tendency to overheat within the range necessary to power a treadmill. GE consistently argues that the motor is a 9 amp motor, and the motor's faceplate says "A 9." Roadmaster's vice president in charge of the treadmill line says that GE told him the motor was an 11.5 amp motor (12/14/2000 Hebb affidavit, Ex. A), and GE knew that Roadmaster wanted the motor to be qualified for use in an 11-11.5 amp DC treadmill. PX 124. Even assuming that Roadmaster reasonably believed the motor to be able to withstand 11.5 amps, there is evidence that it was running too hot within that range. The motor is rated as Insulation Class A, and this rating appears on the motor's faceplate as "Ins. Cl. A." The former head of Roadmaster Life testing testified that the maximum allowable temperature for a Class A motor is 105° Celsius ("C"). Roadmaster claims that GE indicated that the maximum allowable temperature to be used in the tests was between 155° C and 160° C, but regardless of who set the limit, there is evidence that the motor exceeded this limit when run under 11.5 amps. That means it did not meet the specifications for Roadmaster's particular purpose -- use in its treadmills, not to exceed 160° C, below 11.5 amps. A 6/14/1994 Roadmaster test showed that, when the motor was run at 9.5 amps, it reached

18

temperatures of 163° C to 176° or 180° C.[7]  The report indicates that the "motor survived 100 hr test at 9.5 amps."  Roadmaster says that this was destructive testing, where the goal is to run the engine until it fails, but Roadmaster was nevertheless aware that the motor did not meet its own alleged specifications.  When the same engine was run for another 62 hours at 10.6 amps (still within Roadmaster's range of 11.5), the *average* motor temperature was 183° C, with a maximum of 272° C.  DX 77.  A 7/11/1994 Roadmaster test running the motor at between 8 and 8.6 amps showed maximum temperatures of 168° C to 183° C, also exceeding the temperature limits within the within the motor's amp range.  DX 35A-B.  These tests are evidence that Roadmaster actually knew in June or July that the motor was exceeding the acceptable maximum temperature within the amp range that Roadmaster desired.

Moreover, GE argues that Roadmaster knew of the motor's tendency to overheat and cause fires based on customer complaints that the motor was overheating, producing a burning odor, and smoking in March and April 1994, and from two complaints of treadmill fires in May and August 1994.  Although neither the May nor August report indicates the manufacturer of the motor, the August fire was in a Roadmaster Vitamaster treadmill, the line in

_____

[7] The 6/14/1994 test says that the maximum motor temperature recorded was 180°, but that this temperature was recorded when the thermocouple (the device that measures the temperature) lubrication was questionable.  Roadmaster suggests that this means the measurement is inaccurate, but produces no evidence to that effect.

which Roadmaster used the GE motors. Viewed in the light most favorable to Roadmaster, however, a jury could conclude that the May and August fires were not in treadmills with GE motors. But Roadmaster does not dispute that it received the complaints of overheating and smoking where there was no complaint of a "runaway"[8] in March and April, or that they were "typical complaints." No reasonable jury could conclude that Roadmaster should not have known of the problem with the motor and the alleged breach of warranty when it received multiple customer complaints that the motor was overheating, smoking, and emitting a burning odor, even if no actual fire had yet occurred. Roadmaster responds that, if these complaints gave notice to Roadmaster, then GE had notice from its participation in solving the "runaway problem." However, there is no evidence that the complaints of overheating, smoking and burning odors, which contain no reference to a "runaway," were ever forwarded to GE. I have already determined that the evidence Roadmaster submits to show GE's knowledge was insufficient to create a question of fact. *See supra.* The memo discussing shorted and melted motor parts does not reference Roadmaster, and the one complaint of overheating in a "runaway" case in February 1994 is insufficient to give notice that Roadmaster thought there was a breach of any warranty.

---

[8] PX. 62. There were five customer complaints in this exhibit, but one complained of both a "runaway" and that the motor overheated.

The lapse of time between when Roadmaster should have known of the defect in March or April 1994 to when it gave notice of problems with the motor in December 1994 is eight to nine months. Whether the time was reasonable under the circumstances is ordinarily a question for the jury, unless no inference could be drawn from the evidence but that the notice was unreasonable. *Maldonado v. Creative Woodworking Concepts, Inc.*, 694 N.E.2d 1021, 1026 (Ill. App. Ct. 1998). GE cites several cases where courts decided the issue as a matter of law, but they can be distinguished on several grounds. In many of the cases, the plaintiff had given no notice of breach prior to filing suit, *see Klockner v. Federal Wire Mill Corp.*, 663 F.2d 1097, 1379 (7th Cir. 1981); *Microsoft Corp. v. Logical Choice Computers, Inc.*, No. 99 C 1300, 2000 WL 1038143, at *4 (N.D. Ill. July 14, 2000) (Pallmeyer, J.); or the court concluded that the buyer's actions did not amount to adequate notice, *see K & M Joint Venture v. Smith Int'l, Inc.*, 669 F.2d 1106, 1114-15 (6th Cir. 1982); *Standard Alliance Industries, Inc. v. Black Clawson Co.*, 587 F.2d 813, 826-27 (6th Cir. 1978). Here there is no dispute that notice was given prior to suit. In other cases, the period of time between the buyer's knowledge of the problem and the notice of breach exceeded one year. *See K & M*, 669 F.2d at 1115 (17 months); *Hebron v. American Isuzu Motors, Inc.*, 60 F.3d 1095, 1098 (4th Cir. 1995) (2 years); *Wagmeister v. A.H. Robins Co.*, 382 N.E.2d 23, 25 (Ill. App. Ct. 1978) (30 months);

21

*Branden v. Gerbie*, 379 N.E.2d 7, 9 (Ill. App. Ct. 1978) (15 months). In two cases in the Eastern District of Michigan, in which the plaintiffs were merchants, the court held that a delay of eight to nine months was unreasonable as a matter of law. *See Eaton Corp. v. Magnavox Co.*, 581 F. Supp. 1514, 1531-32 (E.D. Mich. 1984) (buyer knew not only of defect, but also of its cause 8 months before giving notice); *Steel & Wire Corp. v. Thyssen Inc.*, 20 U.C.C. Rep. Serv. 892, No. 1976 WL 23706 (E.D. Mich. Dec. 22, 1976) (plaintiff not entitled to wait until conclusion of 12-month investigation to give notice of breach). However, an Illinois court has held that an eleven month delay is not unreasonable as a matter of law where there is no evidence of prejudice to the seller or bad faith of the buyer. *Maldonado*, 694 N.E.2d at 1026. *Maldonado* involved a non-buyer, non-merchant beneficiary of a warranty, but the court did not consider that factor in determining whether the length of the delay was reasonable, only in determining whether the form of the notice was acceptable. *Id.* Here GE has alleged that it was prejudiced by Roadmaster's delay because it could have remedied the problem if it had known sooner, but it points to no facts in support of the allegation. *Cf. Hebron*, 60 F.3d at 1098 (defendant prejudiced by 2 year delay where plaintiff disposed of critical evidence before giving notice). GE's evidence of bad faith here consists of allegations that, in spite of its knowledge that the motor was not fit for use in its treadmills,

22

Roadmaster continued to use it for economic reasons. Roadmaster does not dispute that the GE motor was less expensive than other alternatives, but disputes the amount of the cost savings and produces documents which suggest the decision to change motors was due to availability, not cost. PX 216. There is no evidence of prejudice and only disputed evidence of bad faith; under the circumstances, a jury could reasonably conclude that the eight-to-nine month delay here was commercially reasonable. *See Maldonado*, 694 N.E.2d at 1026.

2.

Neither the implied warranty of merchantability nor fitness for a particular purpose applies to defects that ought to appear to the buyer from examination "when the buyer before entering into the contract has examined the goods or the sample as fully as he desired or has refused to examine the goods." 810 ILCS 5/2-316(3)(b). Whether a particular defect "ought to appear" from testing depends on the "particular buyer's skill and normal method of examination." *Murray v. Kleen Leen, Inc.*, 354 N.E.2d 415, 420 n.1 (Ill. App. Ct. 1976). Buyers are held to an objective standard of what a buyer of a particular product in his field should know. *Trans-Aire Int'l, Inc. v. Northern Adhesive Co., Inc.*, 882 F.2d 1254, 1259 (7th Cir. 1989).

GE argues that the warranties do not apply because Roadmaster tested the motor extensively before purchasing it. Roadmaster

argues that it never tested the modified drive-system, but I have already held that Roadmaster's recovery is limited to the theory advanced by it and its experts – namely, that the motor was defective. GE redesigned the controller in September 1994, but the design of the motor stayed the same. Roadmaster does not dispute that it tested the motor in 1993 before submitting the original purchase orders, or that it continued to test the motor throughout 1994. Roadmaster submitted additional purchase orders throughout 1994 and early 1995, each of which created an individual contract for sale. *See Waukesha Foundry, Inc. v. Industrial Eng'g, Inc.*, 91 F.3d 1002, 1003-04 (7th Cir. 1996) (under nearly identical facts -- initial order followed by confirmation purchase order and acknowledged with invoice -- parties entered into series of contracts). There was nothing in the 1993 qualification tests to put Roadmaster on notice of a problem; the motor did not exceed 160° C or 11.5 amps. However, between the May 20, 1994 purchase order (PX 305G) and the September 24, 1994 purchase order (PX 305H), Roadmaster conducted the June and July tests showing temperatures in excess of 160° C below 11.5 amps. From this it ought to have appeared to Roadmaster that the motors were either unfit for their particular purpose because the motor did not perform at an acceptable temperature at the amps desired by Roadmaster. As an Insulation Class A motor, which has a maximum allowable temperature of 105° C, Roadmaster ought to have been on

24

notice from temperatures of more than 160° C that the motor was not fit for the ordinary purpose of which Class A treadmill motors are used (i.e., that it was not merchantable). Roadmaster says that the temperature specifications came from GE, DX 9 at 45, DX 157 at 152-53, so a jury could conclude that Roadmaster thought that it was ordinary for a motor to operate at 160° C. Even so, however, the July and August tests show the motor exceeding that limit, and if that is a defect that makes the motor unmerchantable, it is one which ought to have been apparent from those tests. Roadmaster is therefore barred under § 2-316(3)(b) from recovering for breach of warranty arising out of purchase orders after the June and July 1994 tests. However, because there was nothing in the 1993 tests which ought to have put Roadmaster on notice of a breach, the warranties are not waived for the purchase orders submitted prior to June 1994.

## C.

Finally, GE argues that Roadmaster is not entitled to consequential damages under U.C.C. § 2-715(2). Roadmaster argues that this is an affirmative defense that must have been affirmatively pleaded. Section 2-715(2) defines consequential damages as (a) damages resulting from the buyer's requirements and needs of which the seller had reason to know at the time of contracting and that could not reasonably be prevented by mitigation, and (b) injuries to person or property that are the

proximate result of a breach or warranty. Proximate cause is an element of the plaintiff's case, not an affirmative defense. *See Bauer v. J.B. Hunt Transport, Inc.*, 150 F.3d 759, 764 (7th Cir. 1998). But mitigation is an affirmative defense that does not negate the plaintiff's proof and on which the defendant bears the burden of proof. *See Rozny v. Marnul*, 250 N.E.2d 656, 666 (Ill. 1969). Although GE never uses the word "mitigation" in its Answer, it alleges that Roadmaster failed to include a circuit breaker. GE's argument under § 2-715(2)(a) is that Roadmaster's damages could have been prevented by the use of a circuit breaker, so Roadmaster had notice of the claim.

GE admits that the fires in motors with defective brushes were caused by the defective brushes, but it argues that Roadmaster's remedy was limited to replacement under the "terms of sale." I have already held that GE's terms of sale do not govern this contract, so the U.C.C. rules for consequential damages govern damages that are the proximate result of the defective brushes. But there are questions with regard to causation of the damages from other allegedly unfit motors.

Diversified Products, a competitor of Roadmaster, used the same motor and used a circuit breaker to prevent the motor from overheating, so GE argues that the failures in motors with correct brushes could have been prevented if Roadmaster had used reasonable measures, *viz.*, a circuit breaker. Roadmaster's expert, however,

opines that motors with the correct brushes would have failed even when the circuit breaker recommended by GE was used. DX 119. This is sufficient to raise a question of fact as to Roadmaster's ability to prevent the damages under § 2-715(2)(a).

Even if the motor was unfit, GE argues, Roadmaster knew about the tendency to overheat from customer complaints as early as 1994 and continued to use it, so the consequential damages from fires in 1995 were not the proximate result of the defect. *See* 810 ILCS 5/2-715(2)(a) & cmt.5. Roadmaster argues that it did not discover that the motor was unfit until the first reports of fires in late 1994 and early 1995 and that the earlier customer complaints related only to the treadmill "runaways." However, I have already held that these complaints of smoke, overheating and burning odors in March and April 1994 were sufficient to put Roadmaster on notice of the existence of a problem even though no fire had been reported yet, so Roadmaster is barred from recovering consequential damages under the warranty of fitness for motors purchased after April 1994. Summary judgment is GRANTED IN PART and DENIED IN PART on Counts III and IV, and GRANTED on Counts I and II.

ENTER ORDER:

**Elaine E. Bucklo**
United States District Judge

Dated:     August 2, 2001

27